STATE ex rel. CHAPEL et al. v. STATE BOARD OF EDUCATION et al.

No. 33386. Aug. 16, 1948.

Rehearing Denied Oct. 12, 1948.

*198 P. 2d 412.*

Glen O. Young and Moraul Bosonetto, both of Sapulpa, for relators.

Mac Q. Williamson, Atty. Gen., and Richard M. Huff, Asst. Atty. Gen., for respondents.

DAVISON, V. C. J. This is an original action in this court wherein relators seek a writ of mandamus requiring respondents, the State Board of Education, its members and officers, to approve for participation in state aid funds the separate elementary school in school district No. 3, Creek county, Okla. The facts are submitted by stipulation.

During the school year 1946-1947 two elementary schools were maintained in common school district No. 3 of Creek county, Okla. The majority school for white students was known as Buckeye school, the separate school for negro students, as Rock Hill school. Both had been maintained for many years and for the year of 1946-47, each had an average daily attendance of 14 pupils. The county superintendent submitted to the State Board of Education an application for the calculation of state aid necessary to provide a minimum program in the separate schools of the county as separate districts for the year 1947-48 which included the Rock Hill school. On July 15, 1947, the finance director of said State Board of Education notified the county superintendent of the board's decision not to consider Rock Hill school as a unit in the calculation of state aid for said year, for the reason that other educational facilities were available, the same being located at Drumright, Okla., a distance of 16 miles by the commonly traveled road.

Relators, being taxpayers and the parents of all the negro children who would have attended Rock Hill school, petitioned the county superintendent; wrote letters to the State Superintendent of Public Instruction; appealed to the Attorney General; petitioned the State Board of Education; appeared before the board of county commissioners; filed an action in the district court of Creek county and, after failing to

secure relief, instituted this proceeding.

The school year has now expired, and since no effective relief can be given, the writ must be denied. But, because the question involved is of great public interest and concern, and because the parties will immediately be again confronted by the same situation, with respect to the school year 1948-1949, we deem it advisable to pass upon the issues presented and to clarify the meaning of the statutes applicable to the situation.

Because of the necessity of segregation of the white and negro races in this state, two individual systems of school management and financing have been provided for; one for the schools of the majority race and one for those of the minority, called separate schools. The Oklahoma Constitution, article XIII, sec. 3, provides:

"Separate schools for white and colored children with like accommodation shall be provided by the Legislature and impartially maintained. . . ."

In the case of Olson v. Logan County Bank, 29 Okla. 391, 118 P. 572, it is said:

"The separate schools required to be maintained by section 3, article 13, are a part of the system of the free public schools provided for in section 1 thereof. In Board of Education of City of Ardmore v. State, 26 Okla. 366, 109 P. 563, it was held by this court that the free public school system which the Legislature of this state was directed to establish by said section 1 is a matter of general or state concern, and not a municipal affair. . . ."

See, also, Chicago R. I. & P. Ry. Co. v. Lane, 69 Okla. 145, 170 P. 502.

In this opinion, reference to school districts will include only dependent or common school districts, and not independent districts, there being a material difference in the management and control of the two classes. The management of the majority schools in each district was, by the Legislature, placed in the official board (70 O. S. 1941, ch. 5) and they are financed by the districts individually. The management of the separate schools is in the county superintendent (70 O. S. 1941 §463) and they are financed by the county as a whole (70 O. S. 1941 §458).

It is readily apparent that, under the above-quoted constitutional provision, there rests upon every public official and board, whether county or state, having any authority or control over the matter, the duty of providing impartial school facilities in each district for the pupils of the majority race and pupils of the minority race. The county superintendent has the duty of determining which is the separate school and which race shall attend each school. 70 O. S. 1941 §453; Musick v. School District No. 41 of Kingfisher County, 186 Okla. 371, 98 P. 2d 590.

If, in any district, the number of children in the separate school, whether negro or white, does not exceed ten and they can be transferred to schools of their own color in adjoining districts, no separate school shall be maintained. (70 O. S. 1941 §459). In the instant case there were 14 students and no negro school in an adjoining district. Therefore, this statute can have no application herein.

The State Aid Act (70 O. S. Supp. 1943 §651.11 and 70 O. S. Supp. 1947 §§652.1-652.11 and 653), was passed for the purpose of establishing and making available for all children a minimum program of education and of providing a method of financing the same by supplementing locally raised revenues with state funds. The act makes no distinction between separate schools and majority schools as to the necessity of financing both, nor could any distinction be made without violating the above-quoted constitutional provision. Section 652.1 of the act provides:

"There shall be apportioned and disbursed annually . . . to the several school districts and separate schools of the state such sums of money as each

school district or separate school may be qualified to receive under the provisions of this act. . . ."

This gives to the officers charged with the administration of the state aid fund no discretion in selecting the school districts or separate schools entitled to receive the benefits thereof, if they qualify under the provisions of the act.

". . . It is only those districts which transfer all their pupils to another district for education which do not receive a share of state aid, and if a district elects to educate its own pupils it receives such portion of state aid as the minimum program requires over and above the amount produced by its local tax levy if it complies with the uniform requirements." School Dist. No. 25 of Woods County v. Hodge, 199 Okla. 81, 183 P. 2d 575.

In the instant case the proper local officers, the county superintendent and county commissioners had done everything within their power to continue the Rock Hill school during the year 1947-48. It then became the duty of the proper state officers, the respondents herein, to apportion and disburse state aid funds for the maintenance of the school if it qualified therefor, to the extent of such qualification. Section 652.8 of Title 70 O. S. Supp. 1947 provides:

"In calculating the minimum program for the separate schools of the county, or any other school district maintaining more than one (1) school outside the city limits or incorporated town, each school may be deemed a school district by the State Board of Education, provided such schools cannot be transported or combined with another school."

As to separate schools, Title 70, chap. 21, sec. 8, S. L. 1943, was almost identical to the last-quoted section of the 1947 act. In the case of Board of Education of Oklahoma City v. State Board of Education et al., 197 Okla. 141, 169 P. 2d 295, this court made the following statement with reference to the 1943 section:

"Both acts specify a 'minimum program' defining same and also specify and define 'minimum program income.' The 'minimum program' directs and specifies the facilities and services to be supplied to and for the schools and the amounts to be paid therefor. Section 8 of the 1943 act quoted, supra, is designed to allow the separate schools, with exceptions shown, to come within the provisions of the law relating to the facilities and services and the costs thereof.

"Note, however, that such provision relates only to calculation of the 'minimum program'. It does not provide that such separate schools shall be so considered in calculation of the 'minimum program income'. Such omission would seem wholly appropriate and deliberate in view of the status of separate schools and the legislative scheme of both acts.

"The acts propose to underwrite by 'state aid' a part of the costs of a minimum standard for all public schools therein shown, including the separate schools. That minimum standard is known therein as the 'minimum program'. They also provide that when such minimum program is met, the cost thereof in excess of the amount raised by the 'minimum program income' will be paid by the state. . . ."

It is argued that the provisions of the section under consideration gave the State Board the discretionary power of combining Rock Hill school with any other separate school. But we do not so conclude. Any one separate school cannot be combined with another separate school except in the instances provided by the act. These apply to situations wherein the average daily attendance for the previous year was less than 13 children. If a school, which has been duly established by the local authorities, has an average daily attendance of 13 or more, the State Board of Education has no discretion in the matter but must approve the same for state aid for the amount for which it qualifies under the provisions of the State Aid Act. Rock Hill school qualified for a one teacher school as certified by the county superintendent.

Respondents have somewhat confused the provisions of the act dealing with the minimum program and those dealing with the minimum program income. For the purpose of the former, each individual separate school qualifying under the State Aid Act may be considered as a school district and then all separate schools of a county must be combined for the purpose of computing the minimum program income and the amount of state aid which is necessary to provide such minimum program in each school.

There seems also to be some confusion as to the relative times of the apportionment of state aid and the making of contracts by the local officers for the purpose of providing the minimum program. Since no indebtedness for any purpose can be incurred in excess of the appropriation for that purpose (62 O. S. Supp. 1947 §310.2) it is necessary that chronological steps in carrying out the educational program be in the following order:

(1) Establishment of the individual separate schools, calculation of minimum program and levy of proper amount of locally assessed taxes with appropriation based thereon.

(2) Apportionment of state aid to the amount qualified for with certification of amount to local officers.

(3) Supplemental appropriation of state aid so apportioned.

(4) Contracts as are necessary to provide minimum program.

(5) Disbursement of State Aid Funds.
Therefore, respondent's argument that the proper contracts should have been made by the local officers to provide the minimum program before there was a duty on their part to pay state aid has no bearing on their duty to make the original apportionment. The local officers had taken all steps they could until the respondents had discharged their mandatory duty of making such apportionment. If other later requirements of the act were not met, pay-

ment of the funds could be withheld until they were.

The provisions of section 896.1, Title 70, O. S. Supp. 1947, disorganizing school districts wherein there is a failure to maintain school for a period of one year has no application herein for the reason that the failure to maintain the Rock Hill school during the year 1947-48 did not result from any failure on the part of the patrons or officers of the school. In order that equity be done in providing for the school year 1948-49, the average daily attendance for the previous year should be considered to be the same as would have been used in providing for the year 1947-48.

Only because the same would not now be effectual is the writ denied.

Writ denied.

HURST, C. J., and RILEY, WELCH, GIBSON, ARNOLD, and LUTTRELL, JJ., concur.