**OKLAHOMA FARM BUREAU et al.,**
Petitioners,

v.

**STATE BOARD OF EDUCATION,**
Respondent.

No. 43002.

Supreme Court of Oklahoma.

July 2, 1968.

Rehearing Denied Aug. 14, 1968.

Charles G. Huddleston, of Otjen, Carter & Huddleston, Enid, for petitioners.

G. T. Blankenship, Atty. Gen., W. Howard O'Bryan, Jr., Asst. Atty. Gen., for respondents.

BERRY, Justice:

Involved herein is petitioners' application in their own behalf, and as a class action for others similarly situated, asking this Court to assume jurisdiction to grant extraordinary relief by Writ of Prohibition against the respondent, State Board of Education. Assumption of jurisdiction is urged upon asserted inadequacy of remedy at law, and because the exigent situation invokes need for determination of matters essentially publici juris, wherein respondent presumes to exercise powers not granted by law. Although the relief sought

must be denied, both imminence of the coming school years, and because ensuing school years of 1969–1970 would provoke identical problems, the Court is of the opinion jurisdiction should be assumed in order to settle present and future questions of public interest.

The following matters disclose the basis of the problem. In 1947 the Legislature enacted laws providing extensive reorganization of earlier laws, directed toward fulfillment of the constitutionally imposed duty to provide for establishment and maintenance of a system of free public schools. Constitution, Art. I § 5; Art. XIII § 5. Although altered and amended in many respects, certain provisions were carried forward without change.

In 1949 the Legislature adopted the Oklahoma School Code. S.L.1949, Chap. 1A, 517 et seq. Therein the State Department of Education was declared the governing body of the Department and the public school system, and charged with responsibility of determining policies and directing administration and supervision of the schools. [See 70 O.S.1961 § 1–6 et seq.] Under the School Code certain prior statutes were carried forward, i. e. sections 2A–4(10) and 7–2, discussed hereafter.

In 1967 the Legislature again amended the school code in several respects, but retained these two cited sections. 70 O.S. Supp.1967, § 1–1 et seq. Under continuation of legislative authority extended therein, the Board was empowered to adopt policies, rules and regulations for operation of the school system, provide formulation and adoption of curricula, and provide *classification, inspection* and *accreditation* of all public schools. 70 O.S.Supp.1967, § 2A–1 et seq., and particularly section 2A–4(10).

On July 7, 1967, the State Board, exercising the authority granted by statute, adopted "Regulations Pertaining To etc. * * *". Subsequently the Board amended regulation No. 5 to provide the exceptions as shown by underscored portion of this regulation. Since petitioners refer only to those regulations attacked, it is necessary to set forth the entire body of regulations forming the basis of the controversy, as an appendix hereto.

On April 19, 1968, petitioners asked the Board to withdraw regulations No. 5, 6, 7, 9, 11, 12, upon grounds the "accreditation standards" set up by these regulations were void, unenforcible, and contrary to law. After hearing and consideration the Board refused to rescind or withdraw the regulations. Thereafter petitioners applied to this Court for special relief, alleging lack of remedy at law, inadequacy of remedy by appeal for impossibility of speedy determination, and because the Board presumes to exercise powers not granted by law.

The narrow issue is whether prohibition should issue against the Board to halt asserted exercise of unauthorized judicial force. Petitioners' attack is premised upon the claim that proper construction and application of two statutes [2A–4 and 7–2] preclude the Board from attempting to adopt accreditation standards different from, and without regard for, those already fixed by legislative enactment. The argument supporting this premise is advanced under three propositions, the first of which urges the Board lacks power to base accreditation upon "average daily attendance" in view of the statutory requirement that accreditation be based upon "average attendance."

The statute claimed to support this argument is 70 O.S.1961, § 7–2, which provides, in pertinent part:

"(a) Any school district not maintaining a school within the district for each of two (2) consecutive years prior to July 1, 1949, is hereby disorganized and the territory comprising such district is hereby annexed to the district or districts maintaining transportation within the transportation area or areas in which such territory is located.

"(b) Any school district maintaining a school or schools within the district and having a legal average daily attendance in such school or schools for one (1) year prior to July 1, 1949, of less than thirteen (13) is hereby disorganized and the territory comprising such district is hereby annexed to the district or districts maintaining transportation within the transportation area or areas in which such territory is located unless such district is designated as an isolated school district by the State Board of Education.

"(c) Whenever any school district shall have had an average daily attendance for one (1) year of less than thirteen (13) or shall have failed to maintain school within the district for one (1) year, the State Board of Education shall declare such district to be disorganized and shall annex the territory comprising such district to the district or districts, maintaining transportation within the transportation area or areas in which such territory is located."

The quoted provisions comprise part of Chap. 1A, S.L.1949, Art. VII, p. 545, dealing with school districts generally, which was a part of the school code dealing with annexation and consolidation of territory. And, in S.L.1947, p. 499, Art. II § 1, first appeared the original statute, prior to amendment, which became 70 O.S.Supp. 1947, § 896.1. Historically, it is noteworthy that prior to 1947 neither the statutory provisions relating to disorganization and annexation of school districts [70 O.S. 1941, § 841–853, inclusive], nor those statutes relating to schools generally and annexation of territory [70 O.S.1941, § 882–890.8, inclusive], carried any numerical basis for disorganization or annexation.

The 1947 enactment, supra, contained the first reference to disorganization and annexation of school districts for failure to maintain a school, or suggested a numerical minimum average daily attendance as a basis for involuntary disorganization of a school district. However, the same en-actment, section 652.2 et seq. provided formulae based upon pupil density in determining the Minimum Program required for school districts' participation in school aid. Cursory examination of the statute, supra, discloses that when the Legislature was establishing and defining the Minimum Program for state aid to schools, such terms as "pupils * * * in attendance," "average number of legally transported pupils", and "legal average daily attendance", appear interchangeably and without separate definition or distinction. And, in section 652.6, dealing with transfers of pupils to another district, it was provided that in computation of *average daily attendance* in the district accepting transfers the prior years' *attendance* in the transferring district should be considered proportionately. These matters are mentioned only because of petitioners' argument, since it appears the Legislature heretofore has not adhered to the meticulous precision of terminology petitioners insist must be applied in considering the two statutes involved, and because much of the argument seems an exercise in semantics.

Petitioners' contention, and the emphasis placed upon the result in State ex rel. Chapel v. State Board of Education, 200 Okl. 610, 198 P.2d 412, require expression of our views relative to interpretation of "average daily attendance" as used in section 7–2, supra, as a legislative declaration encompassing the limit of the Board's authority relative to accreditation of schools.

We pointed out earlier that specific provisions relating to involuntary disorganization and annexation of school districts falling below a minimum pupil requirement first was enacted in 1947, and became part of the general school laws as 70 O.S. Supp.1947, § 891.6. Contrary to petitioners' declaration that section 7–2 has been carried forward as originally enacted without amendment, reference to S.L.1949, Chap. 1A, Art. VII § 2, reflects substantial amendments relating to involuntary disorganization and annexation of school dis-

tricts. Casual examination of all enacted school laws prior to and including 70 O.S. 1961, § 7–2, and as amended by Art. VII, Chap. 141 § 1, Laws 1967, discloses the subject matter of section 7–2 has never been considered otherwise than as part of the statute law governing involuntary disorganization and annexation of school districts.

The power of the Legislature to declare under what conditions and limitations a school may voluntarily or involuntarily cease to function cannot be doubted. The Legislature has seen fit to declare that failure of a district to maintain a school with average daily attendance of 13 pupils, or a district which has maintained a school with average daily attendance of less than 13 must be disorganized. No considerations are involved other than the numerical factor. Excellence of education, high qualifications of teaching staff, or unusual benefits accruing to students provide no grounds for exception. The statute is mandatory. The plain intent and purpose of the statute simply is to declare the minimum point for maintenance of a school, without recourse to any other fact. Whether accredited or not, a school having an average daily attendance of less than 13 pupils mandatorily must be·disorganized and annexed to another district.

The problem in Chapel, supra, arose from the Board's failure to include a separate school as a unit in calculating state aid, because this school had only 14 students and other facilities were available within the transportation area. This action was defended upon grounds the statutes governing administration of the aid program gave the Board discretionary power to combine separate schools. We held the Board lacked authority to combine schools where a regularly established school had an average daily attendance of 13 or more students. Further, the Board had no discretionary power to combine schools, the only authority being to combine school districts under the circumstances set by statute, to-wit: disorganization and annexation where average daily attendance is less than 13 pupils.

Nothing in the statute, or in the Chapel case, indicates legislative intention that section 7–2 of the School Code was adopted for, or contemplated, any purpose other than to define the minimum numerical standard, below which no school district can be maintained, except in case of an isolated district. The obvious intent reflected by the language, and the narrow area of school district affairs upon which the statute was designed to operate, precludes construction or application of this statute as a criterion for any matter relating to accreditation of public schools.

Our conclusion obviates need for discussion of other argument and authorities to the effect that the Board's acts must be confined to the plain language of the statute; that repeal by implication is not favored. Other argument that long continued existence of the two statutes supports the conclusion that "average attendance" in section 2A–4(10) goes only to requiring students to maintain a level of attendance as supporting a basis for accreditation is not persuasive. The code specifically provides for a school year, month and day for attendance. That average attendance was intended as fixing a level below which accreditation could be withheld because school authorities failed to require attendance, is meaningless under statute requiring compulsory attendance.

Petitioners' second contention urges that if *average attendance* as used in § 2A–4 (10) be construed as having the same meaning as *average daily attendance* [§ 7–2], nevertheless the Board would be required to accord the same meaning to the latter phrase as the Legislature and not use or apply a different meaning.

The argument is that if average daily attendance requires only 13 students for a school to be maintained then the Board cannot be permitted to change the legislative standard by requiring 55 students. Upon authority of Oliver v. Oklahoma Al-

coholic Beverage Control Board, Okl., 359 P.2d 183, and decisions there reviewed, petitioners urge the legislative authority granted the State Board to control and supervise public school systems, subject to limitations otherwise provided, did not authorize the Board's establishment of accreditation standards different from those set by the Legislature.

■ From this petitioners say that if average daily attendance under section 7-2 means a minimum of 13 students, then transposition of the same words into section 2A-4(10) would preclude the Board setting any higher standard. As suggested by respondent, if petitioners' premise is correct, the State Board cannot consider school attendance when regulating accreditation of a public school if there is an average attendance of 13 students. If we understand petitioners' argument it is evident that to accept such interpretation in effect would repeal section 2A-4(10) by implication. For this reason we are convinced there is no controlling difference between average daily attendance and the average attendance used in the statute. Neither do we believe the Legislature had any intention of changing the basis of computing attendance factors by the language used.

Petitioners' third contention, which advances the real crux of this controversy, states:

"Even assuming 'average attendance' as contained in Title 70 O.S. § 2A-4(10) means the same as the term 'average daily attendance', 70 O.S. 7-2, all of the legislative standards contained in 70 O.S. 2A-4(10) would have to be applied in determining accreditation of schools in Oklahoma and the Board cannot pick out one statutory standard and ignore the others."

■ Under Constitution, Art. XIII § 5, supervision of public school instruction is vested in the State Board of Education under powers and duties prescribed by law. The legislative standards to be utilized in accreditation of schools were established by enactment of section 2A-4(10), providing:

"Make rules and regulations for the classification, inspection, supervision and accrediting of all public nursery, kindergarten, elementary and secondary schools in the State, which classification shall be intended to give official recognition to the various schools in accordance with their standards of excellence, and which classification shall be based upon the qualifications of the teacher or teachers, library, physical plant, courses of instruction, average attendance in said school, and other factors usually considered in accrediting schools as may be determined by the State Board of Education. The status of no school district shall be changed which will reduce it to a lower classification until due notice has been given to the proper authorities thereof and an opportunity given to correct the conditions which otherwise would be the cause of such reduction. * * *"

It is observed this section contains five fixed standards, and also extends authority to consider other factors in determining accreditation of schools.

Petitioners acknowledge the Legislature's plenary power to delegate authority to the Board to determine facts and enact rules within prescribed legislative standards. Herrin v. Arnold, 183 Okl. 392, 82 P.2d 977, 979, 119 A.L.R. 1471; School District No. 25, etc. v. Hodge, 199 Okl. 81, 183 P.2d 575; Hatfield v. Jimerson, Co. Supt., etc., Okl., 365 P.2d 980. Likewise, they acknowledge the statute, supra, lays down proper standards and prescribes policies for the Board, all of which constitute lawful delegation of legislative authority.

Their position, however, is that the Board has failed to comply with these standards, and in effect has changed existing law both by altering the language of the statute, and by attempting to apply one standard without consideration of other factors. It is urged the legislative standards of sec-

tion 2A–4(10) have been ignored in all respects, including the attendance level prescribed under section 7–2, supra. Without question as to good faith, speciousness of the argument relative to the Board's failure to consider any accreditation factor except average attendance is apparent. Although petitioners at one point assert the Legislature never intended "average daily attendance" to be applied to accreditation functions, they further urge the Board's failure to consider any factor except average daily attendance in determining accreditation.

Had the Legislature considered or intended the numerical requirement of section 7–2 performed any function or limitation relating to school accreditation, no reason would have existed for legislative inclusion and definition of average attendance as a factor when fixing accreditation standards.

■ Petitioners contend the Board cannot omit consideration of any enumerated factor and, in essence, conclude that every factor or standard must be found and determined adversely before accreditation can be withheld. This argument is not persuasive. The legislative standards laid down in section 2A–4(10) define the area and framework under which the Board determines rules for accreditation under the powers granted the Board (§ 2A–4) for control and supervision of public schools. Whether Board action denying accreditation upon consideration of only a single factor would be proper or arbitrary in a given case we need not decide at this time.

■ The statute, section 2A–4(8), requires the Board to formulate and adopt curricula and courses of study necessary for adequate instruction of pupils in public schools. One standard legislatively denominated in section 2A–4(10) concerns the courses of instruction which must be considered in fixing classification and accreditation of schools. In providing education standards the Board has determined the legislative demand for excellence of education requires a course of study comprised of thirty-six units, of which no more than eight shall be alternate units (i. e. taught in alternate years).

By agreement of the parties during oral presentation of the cause, the Court was furnished an alphabetized list of 161 high-schools showing enrollment, units taught and units carried over as to each school. This compilation discloses that 94 schools listed have an enrollment in excess of 55 pupils, but none of this number offers the required 36 units of study as prescribed by the Board's Regulations. Sixty of the listed schools depend upon alternate courses in excess of the prescribed maximum of eight in the course of study offered. The coverage in alternate courses range between one-half alternate unit in one school of 62 pupils offering only 23½ units instruction, to a school having an enrollment of 62 students which offers 23 units of instruction of which 13 units are alternate courses. Another school with 63 pupils offers 19 units of instruction of which 17 units are alternate courses.

These matters effectively negate petitioners' argument the Board considered only the average attendance factor in determining suitability for accreditation. At the same time, it is clear the Board's Regulations not only fall within the standards set by the Legislature, but also comply with legislative direction to provide excellence of education for public school pupils in this State.

The provisions of 70 O.S.1961, § 7–2 establish a mandatory minimum attendance limitation governing involuntary organization of school districts. This statute neither was intended nor does it bear relation to the average attendance factor adopted by the Legislature in fixing standards for classification, inspection, supervision and accreditation of the public schools. The power of the Legislature to delegate to the State Board of Education its own authority as respects establishment, control and change of school districts cannot be questioned. A proper delegation of this

power was evidenced by enactment of 70 O.S. 1961 § 2A–4(10), authorizing the Board to make rules and regulations respecting accreditation of schools, based upon standards or factors therein enumerated. The rules adopted by the Board in order to implement determination of proper accreditation, including consideration of average daily school attendance as one factor, are within the confines of the standards delineated by the Legislature as necessary to carry out the legislative policy declared in response to the constitutional obligation.

Herrin v. Arnold, supra; School District No. 25 v. Hodge, supra.

The judgment in this cause is effective upon filing of this opinion with the Clerk, as provided under Rule 40 of the Rules of this Court.

Writ denied.

IRWIN, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD, HODGES, LAVENDER and McINERNEY, JJ., concur.

## APPENDIX

### REGULATIONS PERTAINING TO ACCREDITING SCHOOLS IN OKLAHOMA BEGINNING WITH THE SCHOOL YEAR, 1968–1969

Regulation 1. Beginning with the school year, 1968–69, each high school in the State of Oklahoma shall offer a minimum of thirty-six (36) units of approved course work. Eight (8) of these units may be on the two (2)-year alternation plan with twenty-eight (28) units to be offered in the current school year.

Regulation 2. Provided that a high school, which is a participating member of a vocational-technical school during the current school year, shall be offering thirty-two (32) units of approved course work with a minimum of twenty-four (24) units to be offered in the current school year.

Regulation 3. Provided that in a three-year senior high school, those ninth grade subjects being offered in its affiliated junior high school may be counted toward meeting the total requirement.

It is strongly recommended that the distribution of the minimum offering of thirty-six (36) units be as follows: Language arts, five (5) units; science, four (4) units; mathematics, four (4) units; social studies, five (5) units; foreign language, two (2) units; fine arts, two (2) units; health-physical education and driver education, two (2) units; and applied vocations, twelve (12) units.

Regulation 4. No teacher will be approved to teach in excess of six (6) periods per day. It is strongly recommended that teachers not be assigned to teach in excess of five (5) periods per day.

Regulation 5. Beginning with the school year, 1968–69, no high school will be accredited whose average daily attendance the previous year was under fifty-five (55) students in legal average daily attendance. Provided a high school with not less than forty (40) average daily attendance and serving one hundred ten (110) square miles, or more, in its transportation area shall be allocated, for accrediting purposes only, one (1) additional average daily attendance for each ten (10) square miles or major fraction thereof so served. Provided further, that the maximum additional allowance shall in no case exceed fifteen (15) average daily attendance.

Regulation 6. Beginning with the school year, 1969–70, no high school will be accredited whose average daily attendance the previous year was under sixty-five (65) students in legal average daily attendance.

Regulation 7. Beginning with the school year, 1970–71, and every school year thereafter, no high school will be accredited whose average daily attendance the previous year was under seventy-five (75) students in legal average daily attendance.

Regulation 8. In calculating the average daily attendance for a high school under this regulation, the average daily attendance of the ninth grade students in the affiliated junior high school shall be counted. Provided, students may be counted in attendance for accrediting purposes if they are in legal attendance under any Oklahoma School Law.

Regulation 9. Beginning with the school year, 1968–69, a high school may qualify for isolation for purposes of accrediting if it had an average daily attendance of at least forty (40) students the previous year and is sixteen (16) miles or more from a high school offering an approved program, and if the high school meets all other requirements for accrediting.

Regulation 10. Beginning with the school year, 1968–69, no elementary school in the State of Oklahoma shall be considered for accrediting, unless the board of education having authority in that district employs and uses in the instructional program housed in that unit in the full-time equivalency of one (1) full-time teacher for each two (2) grades in the organization.

Regulation 11. Beginning with the school year, 1968–69, no elementary school shall be accredited unless the average daily attendance of legal students the previous school year was thirty (30) or more for grades 1 through 6, or forty (40) or more for grades 1 through 8.

Regulation 12. Beginning with the school year, 1968–69, an elementary school may qualify for isolation for purposes of accrediting if it had an average daily attendance of twenty (20) the previous year and is sixteen (16) miles from a school offering an approved program. Provided, the school employs a minimum of two (2) full-time teachers.

Regulation 13. It is strongly recommended that beginning with the school year 1968–69, the teacher-pupil ratio in any elementary school in Oklahoma not exceed the ratio of one (1) to twenty-five (25). This ratio is to be based on membership as of October 1 of the current school year. This is to apply to the school unit. No administrative or supervisory time is to be used in calculating the pupil-teacher ratio.

Provided that during the school year, 1968–69, a study will be conducted to determine if regulations six (6) and seven (7) are feasible.